(172 App. Div. 359)

SAGER et al. v. RENWICK PARK & TRAFFIC ASS'N et al.

(Supreme Court, Appellate Division, Third Department. May 3, 1916.)

1. LANDLORD AND TENANT ⬅157(1)—CONDITION OF LEASE—WAIVER.

Where the lessor of an amusement park turned over to the lessee the sum of $1,500 as a loan, to enable him to perform his covenant in the lease to expend $3,500 in the construction of an outdoor theater and the

installation of lights, the transaction was a waiver of the lease provision that the lessee should furnish an itemized statement of the materials and labor used in constructing improvements.

[Ed. Note.—For other cases, see Landlord and Tenant, Cent. Dig. §§ 571–573; Dec. Dig. 157(1).]

2. MECHANICS' LIENS 75(2)—LIEN AGAINST LESSOR—STATUTE.

Under Lien Law (Consol. Laws, c. 33) art. 2, § 3, a covenant on the part of a lessee of an amusement park to maintain it in its then condition and to use his best efforts to improve its popularity, etc., was not a general consent on the part of the lessor to involve it in liability to materialmen and laborers on any constructions which a sublessee might conceive to be useful, since the statute requires a consent or request to the lienor on the part of the owner of the property to be subjected to a lien.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 105; Dec. Dig. 75(2).]

3. MECHANICS' LIENS 20—IMPROVEMENTS BY SUBLESSEE.

The sublessee of an amusement park could subject its property in the lease to the lien of materialmen and laborers for and on an outdoor theater building.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 21; Dec. Dig. 20.]

4. MECHANICS' LIENS 63—CONSENT OR REQUEST OF OWNER.

Where the lessor of an amusement park consents to the construction of expensive improvements by the sublessee, or requests them to be made, its land is liable to materialmen and laborers to satisfy their liens thereon.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 80; Dec. Dig. 63.]

5. MECHANICS' LIENS 63—IMPROVEMENTS BY SUBLESSEE—CONSENT OF OWNER.

Consent of the lessor of an amusement park to the construction of an outdoor theater by the lessee at an agreed price of $3,500, upon lines, plans, and location mutually agreed upon between the lessor and lessee, is not a consent to the construction by a sublessee of such improvements as the latter may elect to construct at a cost greatly in excess of $3,500.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. § 80; Dec. Dig. 63.]

6. MECHANICS' LIENS 61—CONTRACTUAL BASIS.

It is essential to the creation of a mechanic's lien that there be a contract relation, express or implied, between the owner of the premises and the materialmen or laborers.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 77, 78; Dec. Dig. 61.]

Appeal from Trial Term, Tompkins County.

Action by William E. Sager and another against the Renwick Park & Traffic Association, the New York State Dredging Corporation, and others. From a judgment against the named defendants, they appeal. Judgment reversed, and new trial granted.

Argued before KELLOGG, P. J., and LYON, HOWARD, WOODWARD, and COCHRANE, JJ.

Charles H. Blood, of Ithaca, for appellant Renwick Park & Traffic Ass'n.

Jared T. Newman, of Ithaca, for appellant New York State Dredging Corp.

George S. Tarbell, of Ithaca (John Alfred Kelly, of Ithaca, of counsel), for respondents Sager and Nelson.

Cobb, Cobb, McAllister & Feinberg, of Ithaca (A. W. Feinberg, of Ithaca, of counsel), for respondents Ithaca Traction Corp. and Fred T. Ley & Co.

WOODWARD, J. This action was brought to foreclose mechanics' liens. The Renwick Park & Traffic Association is the owner of certain premises used as an amusement park. This association, on the 5th day of May, 1914, entered into a written lease with one Paul K. Clymer, by the terms of which the said Paul K. Clymer covenanted and agreed that he would take the said premises, subject to a lease for the year 1914 to one William Jarvis, and subject to the right of the Renwick Park & Traffic Association to "make such changes or improvements therein by virtue of the contract now existing between the party of the first part and the New York State Dredging Corporation" during the seasons of 1914, 1915, 1916, 1917, 1918, and 1919, "with full privilege to the party of the second part, so long as he lives up to the terms of this lease, to grant concessions, to lease grounds for purposes appropriate thereto, and to enjoy and receive the money rent from such concessions and leases." The party of the second part (Clymer) further covenanted that he would, "for the use of said premises, do all in his power to maintain the park in attractive condition and increase its popularity as a pleasure resort, and will keep the grounds in a satisfactory condition for the purpose of a pleasure resort, and will also at his own expense keep the buildings and docks in as good condition and repair as they now are, and will install and leave thereon at the expiration of his lease the necessary equipment for lighting the buildings now situated upon the premises, and will pay to the party of the first part as rental during the season of 1914 and 1915 all taxes that may be taxed or assessed against said premises, and all insurance premiums placed upon buildings and fixtures by the party of the first part, to an extent and valuation of not to exceed $10,000 of insurance, and will pay all interest on the mortgage hereafter to be given to the New York State Dredging Corporation," etc.

Other provisions were made for the payment of the rentals for the remainder of the term, and the party of the second part further covenanted "to expend the sum of thirty-five hundred dollars ($3,500) in the construction of an outdoor theater along lines and plans and in a location to be mutually agreed upon between the party of the first part and the party of the second part, and in the installation of lights and permanent improvements to be mutually agreed upon between the parties hereto, which said sum is all to be expended during the year 1914; it being covenanted and agreed that, unless hereinafter mutually otherwise agreed, at least $3,000 of said $3,500 shall be expended in the construction of the theater and equipment, and in consideration thereof the party of the first part agrees to provide for $1,500 of said

$3,500 so to be expended, and the party of the second part covenants and agrees to repay to the party of the first part the sum of $1,500, with interest, on or before the expiration of this lease by lapse of time or by breach, and to secure such payment assigns and agrees to pay the party of the first part the entire net income derived from the operation of said theater up to the sum of $675 each year," etc. "And the party of the second part agrees to keep and deliver to the treasurer of the party of the first part from time to time as the services are rendered an accurate itemized bill for the material, labor, and improvements expended on said premises, and which sums as hereinabove provided are to aggregate at least the sum of $3,500 to be expended during the year 1914, and the said sum of $1,500 to be advanced by the party of the first part is to be advanced in the adjustment of such itemized bills."

It was then further understood and agreed "that the title of the aforementioned theater and its equipment, and to all other property and amusement devices placed upon the premises hereby leased," should be vested in and remain in the parties of the first part, "unless otherwise mutually agreed upon in writing between the parties hereto from time to time, but that at the expiration of this lease, in the event that the party of the second part has repaid to the party of the first part the $1,500 advanced, with all accrued interest thereon, and also has made over all other payments and faithfully performed as in this agreement provided, that then and in that event the party of the first part will at its option (1) either repay to the party of the second part the then present value of said theater and its equipment, * * * or will permit him to remove the same from the leased premises, or to give to the party of the second part the privilege of operating the said theater without rental charge for a period of three years hereafter, subject to such reasonable restrictions as may hereafter be mutually agreed upon, and as shall not be detrimental to the orderly operation of said park; and (2) the party of the first part will also at its option either repay to the party of the second part the then present value, to be determined by appraisers selected as aforementioned, of all other property, except lighting equipment, hereinbefore referred to, placed in said park by the party of the second part, which are not permanently attached to and a part of the real estate unless at time of construction agreed to be personalty, or will give in writing to the party of the second part a bill of sale of such property so installed by the party of the second part and permit him to move the said property from said premises." It was further agreed that the party of the second part might renew the lease, under certain conditions, for a period of five more years.

[1] After this lease was executed the Renwick Park & Traffic Association turned over to Clymer the sum of $1,500, which was obviously a loan to enable him to perform his covenant of expending "the sum of $3,500 in the construction of an outdoor theater" and in the installing of lights, and may be construed as a waiver of the condition that Clymer was to furnish an itemized statement of the materials and labor used in the construction of the improvements. But the net result of the contract expressed in the lease was that Clymer leased

the premises for a term of five years, with an option of a second term of like duration, and that he was to erect a summer theater upon the property, to be operated by him during the term, and then to be turned over to the lessor at a fixed price. The provision that the title should vest in the lessor was merely in the way of security; the lease fairly contemplating that the lessee should pay certain rentals, and should be reimbursed for any improvements which he made upon the property, or be permitted to remove the same. But the theater was to be constructed "along lines and plans and in a location to be mutually agreed upon between the party of the first part and the party of the second part," and this, of course, required the approval of the party of the second part to the erection of any theater building upon the property. It reserved to itself the right to determine upon what lines and plans the building should be constructed, as well as its particular location, and it cannot be deemed to have consented to the construction of any building which an amusement company, subsequently incorporated and entering upon the property under a lease from Clymer, might see fit to contract for. The lease provided specifically for the expenditure of $3,500 "in the construction of an outdoor theater along lines and plans and in a location to be mutually agreed upon," and before any laborer or materialman, contracting with the Renwick Park Amusement Company, Incorporated, sublessee, could charge the owner of the land with responsibility for the price of materials and labor, it would be necessary to show that the Renwick Park & Traffic Association had consented to the construction of the particular building at least.

The Renwick Park Amusement Company had not taken an assignment of the lease existing between the Renwick Park & Traffic Association and Clymer, covenanting to fulfill his covenants, but had become a sublessee, and it was with this corporation that the materialmen and laborers dealt in the construction of the buildings and improvements for which liens were filed against the premises. The most that could be properly claimed, it would seem, would be that the Renwick Park & Traffic Association had consented to the construction and equipment of a summer theater upon the premises of a value not to exceed $3,500; but it is not disputed that more than this sum in cash has already been paid on account of this property, and it is now sought to charge the owners of the land with improvements aggregating $5,177.46, in addition to the sum of $6,110.84 which the Amusement Company has paid in cash on account of said improvements.

[2] No evidence is claimed to exist outside of the lease to Clymer of any consent on the part of the Renwick Park & Traffic Association to the construction of the improvements for which these liens are filed, and it is attempted to make the covenant of Clymer that he "will for the use of said premises do all in his power to maintain the park in attractive condition and increase its popularity as a pleasure resort, and will keep the grounds in a satisfactory condition for the purposes of a pleasure resort, and will also at his own expense keep the buildings and docks in as good condition," etc., the foundation for such alleged consent. But a covenant to maintain the park in its then condition, and to use his best efforts to improve its popularity, is clearly

not to be tortured into a general consent to involve the corporation in any and all constructions which some third party may conceive to be useful. The statute (Lien Law, art. 2, § 3) provides that:

"A contractor, subcontractor, laborer or materialman, who performs labor or furnishes materials for the improvement of real property with the consent or at the request of the owner thereof, or of his agent, contractor or subcontractor, shall have a lien for the principal and interest of the value, or the agreed price, of such labor or materials upon the real property improved or to be improved and upon such improvement, from the time of filing a notice of such lien as prescribed in this article."

While the courts, under the admonition of the statute, have been liberal in construing this provision, it is still necessary that there should be a consent or request on the part of the owner of the property to be subjected to the lien in order to charge the property.

[3-5] The Renwick Park Amusement Company, as the holder of a term under its sublease from Clymer, could, undoubtedly, subject its property in such lease to the lien of materialmen and laborers; but could it involve the Renwick Park & Traffic Association in such liability as to its fee in the land? Of course, if the owning corporation had consented to the construction of these expensive improvements, or had requested them to be made, its land would be liable to lienors; but the consent to the construction of an outdoor theater and equipment at an agreed price of $3,500, to be constructed upon lines and plans and upon a location to be mutually agreed upon between the Renwick Park & Traffic Association and one Clymer, and which lines and plans and location are not shown to have been so mutually agreed upon by the parties to the original lease, is not a consent to the construction by the Renwick Park Amusement Company of such improvements as it may elect to contract for far in excess of the figures named in the lease with Clymer. The Renwick Park & Traffic Association parted with the ownership of a five-year term of this property upon named conditions. It had a right to limit its liability by the terms of that agreement, and it did not consent that Clymer could erect such buildings and improvements as he might elect, but that he should "expend the sum of $3,500 in the construction of an outdoor theater along lines and plans and in a location to be mutually agreed upon between the party of the first part and the party of the second part"; and if we are to assume that it was a matter of indifference to the lessor by whom such money was expended, we yet have no right to read into this contract a consent or request for the construction of the improvements for which the Renwick Park Amusement Company subsequently contracted.

[6] In Jones v. Manning, 6 N. Y. Supp. 338, 340,[1] the court, speaking through Mr. Justice Barker, say that:

"In the case before us the plaintiff contracted with the defendant Crumb, the tenant in possession, to make repairs upon the buildings, who alone agreed to pay for the same; and he being an owner within the meaning of the statute, his interest only was made subject to the lien. There was no employment of the plaintiff by the owners of the fee, and they never became

---

[1] Reported in full in the New York Supplement; reported as a memorandum decision without opinion in 53 Hun, 631.

indebted to him in any manner for the work and labor which he performed. The referee has found, as a fact, that during the performance of the work and the furnishing of the material Frederick Krapp, one of the lessors, was present on different occasions while the repairs were being made, and conversed with the plaintiff, and consented thereto. Upon this finding it cannot be held, as matter of law, that Krapp became a party to the contract, or in any manner indebted to the plaintiff for making the repairs upon the hotel property. No lien can be created upon the interest of an owner, except when he has entered into a contract, either express or implied, to pay for the work and labor. Knapp v. Brown, 45 N. Y. 207. The mere consent of the owners of the fee that his tenant for a term of years may improve the premises by erecting buildings thereon, or repairing those already constructed, does not obligate him, either legally or morally, to pay for the same. The tenant had the right to make the repairs without the consent of his lessors, and it is absurd to claim that the approval of the act of their tenant in this respect amounted to a consent on their part that their title might be charged with the cost of the repairs, if the tenant failed to keep his promise to pay the contractor therefor. In Knapp v. Brown, supra, it was one of the express terms of the lease that the tenant should make certain specified repairs and improvements as one of the considerations for making the lease, and the court held that this did not subject the lessor's title to a lien in favor of the contractor who made the repairs."

It is true that the statute has been changed somewhat in form since Mr. Justice Barker wrote, but it is still necessary that the consent of the owner should be secured, or that he should request the work to be done, and that there should be a contract relation, expressed or implied, between the owner and the materialman or laborer. The statute contemplates that the owner of property shall not be charged with the cost of improvements made upon his premises without such an assent to such improvements as would morally obligate him to pay for the same, and where an entire stranger to the contract contained in the lease enters upon the premises under a sublease and elects to make improvements, the owner of the fee, without his consent, cannot be morally or legally liable for the payment of the debt of such stranger. Whether the lienors could have enforced an obligation against the Renwick Park & Traffic Association for the construction of a theater costing not more than $3,500 is not before us. No such question is here presented. More cash has been expended upon these improvements than the contract called for.

The question here is whether a building and other improvements, not contemplated by the lease, and which were not constructed by Clymer, but by his lessee, under no contract obligation to construct any buildings or improvements whatever, can now become a charge upon the fee of these premises. We find nothing in the contract of lease which authorized Clymer to construct buildings or improvements in excess of $3,500, and these only under special conditions; and without some evidence that the owners of the fee consented to these erections under such conditions as to impose a moral obligation at least, we can see no foundation for the judgment now under consideration. The tenant in possession had a right to make these improvements without the consent of the owners. Jones v. Manning, supra. It merely took the risk of losing the investment, which was not provided for in its lease, and, as was said by Mr. Justice Barker:

"The mere consent of the owner of the fee that his tenant for a term of years may improve the premises by erecting buildings thereon, or repairing those already constructed, does not obligate him, either legally or morally, to pay for the same."

The consent contemplated by the statute is not a consent given to the tenant, but a consent given to the materialman. It is a holding out of the owner as acquiescing in the giving of credit which is at the foundation of the right to a lien against the owner of the fee, and where the contract is made with a tenant in possession under a lease having no connection whatever with the owner of the fee, it cannot reasonably be contended that the latter is either morally or legally bound to compensate the lienors.

The case of Otis v. Dodd, 90 N. Y. 336, on which the learned court below relies, is to be distinguished from this case by the fact that in that case the owner of the fee leased the premises to the Union Portland Cement Company, under a contract which required that company to construct certain buildings upon the premises, and to permit them to become a part of the realty. The Cement Company entered into a contract for the construction of these particular buildings, and the lessors came upon the premises, and assisted in locating the buildings, and gave directions as to their construction. The sole question determined by the court in that case was whether "the simple consent of Dodd and Ross to the making of the erections and improvements upon their real estate was sufficient, under the act referred to, to give the plaintiff a lien upon their interest in the real estate," and it was held that it did. There, however, the improvements were required by the contract for the benefit of the lessors, while in the case at bar the lessee is to have the benefit of such erections. There the lessee, who was bound to make the erections, entered into the contract for the construction of the buildings in pursuance of the contract, while here the lessee sublet the premises, and the subtenant entered into a contract for improvements not contemplated by the original lease, and which are not shown to have been constructed with the consent of the owners of the fee.

The lienors, before entering into their contract, could have ascertained the extent of the interest of the Renwick Park Amusement Company in the premises, and consequently the adequacy of their lien as security (Knapp v. Brown, 45 N. Y. 207, 212), and having elected to contract with a corporation having no relations whatever with the owner of the fee, and no facts appearing which would charge the latter with having consented to the improvements in excess of those contracted for in the lease with Clymer, there is no legitimate foundation for the assertion of a lien against the Renwick Park & Traffic Association.

The judgment should be reversed.

LYON and COCHRANE, JJ., concur.

JOHN M. KELLOGG, P. J. (concurring in result). The evidence is not before us, and the only question present is whether the findings support the judgment. I think we may well assume that the Amuse-

ment Company took the place of Clymer, and that any consent by the owner that he might make improvements would apply to it. The lease was a consent and a requirement that the theater be built, equipped, and lighted. It contemplated, however, that it should be along lines and plans and in a location mutually to be agreed upon, and that the lights to be installed should be mutually agreed upon, and that at least $3,000 of the proposed expenditure of $3,500 should be upon the theater and its equipment. The owner could waive these requirements, and if it permitted the theater to be built, lighted, and equipped, and had knowledge of the work as it was progressing, it may be held to have waived such provisions, and to have intrusted those matters to the judgment and discretion of the lessee. If it did not approve, it was its duty to object. Silence itself, with knowledge of the facts, might be considered as a consent, or a waiver of the provisions.

The only finding tending to show that the theater was built, equipped, and lighted, or that the other improvements were made with the consent of the owner, is finding 27b, that the owner, "aside from the knowledge it acquired by virtue of the terms of said lease, had a general knowledge and information that improvements of the same general character as those described in the lease were being made, or had been made, but it had no specific knowledge as to the details of the work, nor did it assume to exercise any control over the execution of said work or the extent of the same." This is not a finding that the owner knew how the theater was being built, or that it was being built, or that its owner had waived the plans and other requirements, and had committed those matters to the lessee. The finding might be of force, were it not for the words "or had been made." Those words render it valueless as showing consent of the owner. It may be that the owner had no knowledge of the fact that the theater was being built until after the work was substantially finished. If a sketch of the building was shown the owner, and it made no objection, or if it permitted the construction of the building without inquiry, those and perhaps other facts might tend to show a waiver of the provision for the plans, the mutual agreement, and the cost.

It is perhaps probable that the owner had such knowledge, and by raising no objection to the work in progress has put itself in a position where it cannot object to the building, or to the expense thereof. It is not clear that all of the plaintiff's claim was with reference to the theater and its equipment; neither is it clear that the bill of the respondent Williams related only to the lighting or equipment of the theater. Apparently they embraced other matters. In the view we take of the case, the building, lighting, and equipment of the theater were required by the lease, and the lease itself furnished the necessary consent of the owner, if the lessee or his assignee fairly complied with the terms of the lease as interpreted by the parties, or as its specific terms were waived or changed by their acts. We cannot, however, from the finding determine those facts in the absence of evidence, and with some reluctance we feel that the judgment in favor of the plaintiff and claimant Williams must be reversed, as not sustained by the findings.

There is nothing in the lease itself to indicate that the lowland was to be filled in, or that a miniature railway was to be constructed, or that the foundation and approaches to an air drome were to be erected, with a fence around the street railway loop. Those were matters ordinarily resting in the discretion of the tenant, which might or might not be done as he chose. The landlord cannot prevent the tenant from erecting trade fixtures upon his property, and by not objecting to them he does not consent to them in such a way as to make the property subject to a lien for their cost. The tenant was obliged, as most tenants are, to keep the premises in repair, sightly, and in good condition; but it does not give him full liberty to do what he wishes and charge the cost thereof upon the leased property. In the absence of evidence tending to show that these improvements were made pursuant to the requirements of the lease, and as a part of the expenditures of the $3,500 mentioned therein, it is difficult to see how a lien for their cost can be impressed upon the property. It was not contemplated that the owner should be responsible for such improvements. The lease contemplated that all property or amusement devices (except the theater and its equipment) put upon the land by the tenant should be the property of the landlord, apparently as security for his performance of the lease, with an option to the landlord to acquire all property not permanently attached to the land (aside from the lighting equipment), at an appraised value; if not so acquired, the tenant could remove the same. The miniature railway, the air drome, and fences may fall within this provision, and if the lessee performed its lease the property was removable, unless the lessor purchased it. We do not know what the evidence was with reference to these claims. We can only say, in the absence of the evidence, that there is nothing in the finding to sustain a lien for such expenditures.

The judgment, so far as appealed from, should be reversed, and a new trial granted, with costs to the appellants to abide the event.

HOWARD, J., concurs.