[631 NYS2d 642]

Canron Corp., on Behalf of Itself and All Others Similarly Situated, Respondent, v City of New York et al., Appellants.

First Department, September 14, 1995

## APPEARANCES OF COUNSEL

*Michael S. Adler* of counsel, New York City *(Francis F. Caputo* on the brief; *Paul A. Crotty, Corporation Counsel* of New York City, attorney), for appellants.

*Glen J. Fuerth* of counsel, New York City *(David S. Sheiffer* on the brief; *Wilson, Elser, Moskowitz, Edelman & Dicker,* and *Ray L. LeFlore,* attorneys), for respondent.

## OPINION OF THE COURT

RUBIN, J.

This appeal presents a question with respect to the interpretation of section 70 (1) of the Lien Law. Specifically at issue is when funds are considered "received by a contractor under or in connection with * * * a contract for a public improvement in this state" so as to be impressed with a trust in favor of a subcontractor. It is clear from the facts stipulated by the parties and submitted to Supreme Court for decision (CPLR 3222) that the contractor received valuable consideration for the disputed check at its full face value. The dissenter, however, construing the statute literally, finds it dispositive that the contractor did not physically have possession of the proceeds of the check. Therefore, he reasons, it is not the funds themselves but only a "right of action for * * * funds due or earned" (Lien Law § 70 [1]) which is subject to the trust impressed by the Lien Law. And since plaintiff subcontractor, as the beneficiary of the trust (Lien Law § 71 [2] [a]), can assert no greater claim than the contractor (Lien Law § 70 [1] [a]), defendant City can offset against the amount it owes to the contractor the contractor's rent arrears under a lease of City property. As the total of the contractor's rent arrears exceeds the amount due under the contract, the dissenter concludes that the funds in the City's possession are not assets of which the contractor is trustee (Lien Law § 70 [6]).

Because the equities of this matter predominate greatly in

favor of plaintiff subcontractor, and because the contractor had at least constructive receipt of the funds at issue, this Court declines to adopt such a mechanistic approach. The disputed check was received from an insurance company as final payment for repair work, performed at the City's behest and approved by it for payment by the insurer. As such, the proceeds are clearly identified to the construction project and, indeed, the check was issued to the City and the contractor, as joint payees. Pursuant to a written agreement with the contractor, the City thereupon credited the contractor with the full face value of the check and transferred this amount to City coffers by applying it to the contractor's rent arrears. This Court will not permit the City to evade the operation of the Lien Law by means of a transaction that assigns to the City a sum not only due but fully credited to the contractor in connection with its repair contract.

This controversy arises as a result of storm damage to a marine terminal owned by the City of New York and rented to Northeast Marine Terminal Co. Under the terms of the lease, the City retained the option to repair, rebuild or replace any destroyed portion of the premises. Exercising its option, the City engaged Northeast to oversee the necessary repairs to two Starporter cranes located at the terminal. Pursuant to the express terms of its contract with the City, Northeast retained plaintiff Canron Corporation to perform the bulk of the work.

In effecting the repairs, plaintiff furnished material and labor valued at $797,549. All invoices submitted by plaintiff were approved for payment by Northeast, as lessee and contractor, by the City, as owner, and by Northeast's insurance carrier, a component of Chubb & Sons. With respect to the Starporter cranes, the policy of insurance provides that "the City of New York Department of Ports and Terminals is included as an additional Insured and loss payee." As the repair work proceeded, Chubb issued six checks totalling $942,816 payable to the City and Northeast jointly. Northeast endorsed and delivered the checks to the City. The City, upon approval of the work and plaintiff's supporting invoices, remitted payment of the first check to plaintiff and the subsequent four checks to Northeast. The sixth and final check is the subject of this controversy.

During the course of the repair work, Northeast accumulated rent arrears under its lease with the City in the amount of $722,150. Northeast entered into negotiations with the City, which culminated in an agreement dated July 9, 1981 by

which Northeast undertook to "assign all our right title and interest in said Chubb draft" (the last check issued in the amount of $290,579.03) to the City, to be applied to rent arrears in accordance with a contemporaneous stipulation. Plaintiff received no payment on its final invoice totalling $265,271.90. In November 1981, Northeast filed for bankruptcy, and the City deposited the proceeds of the final check from Chubb into a segregated account (see, Lien Law § 75).

Canron commenced this action in February 1982 under article 3-A (§§ 70—79-a) of the Lien Law. The case was submitted to Supreme Court for decision on stipulated facts. The court found that the City conceded the repair work performed by Northeast constitutes a public improvement under Lien Law § 70 (1). It determined that, although Northeast is an "owner" pursuant to Lien Law § 2 (3), as the party engaged to undertake the repairs, it is also a contractor pursuant to section 2 (9) of the statute (citing *Burns Elec. Co. v Walton St. Assocs.*, 136 AD2d 291, 294-295, *affd* 73 NY2d 738). The court held that, by endorsing the final insurance check and requesting that the City apply the proceeds to rent arrears, Northeast diverted trust assets (Lien Law § 72 [1]) from their intended use for the benefit of beneficiaries designated in section 71, including "payment of claims of subcontractors" (Lien Law § 71 [2] [a]). The judgment appealed from orders the City to account to plaintiff for the segregated funds (Lien Law § 77 [3] [a] [i]) and directs that plaintiff recover against the account to the extent of its claim, a sum of $265,271.90, together with interest pursuant to statute (Lien Law § 77 [3] [a] [i], as amended eff July 18, 1985).

On appeal, defendant City advances the single argument embraced by the dissenter—that the claim of Northeast to the insurance proceeds received from Chubb is subordinate to the concurrent debt of the contractor to the City. Therefore, it contends, it was free to enter into the agreement with Northeast to apply the proceeds to rent arrears without transgressing the provisions of the Lien Law. The stipulated facts emphasize a provision in the insurance policy which recites: "It is hereby agreed that The City of New York Department of Ports and Terminals is a named insured under this Policy with respect to the 70 ton and 50 ton Starporter Cranes, and loss, if any, is payable to them." The City contends that plaintiff, as subcontractor, can assert no greater right to the funds than Northeast, as contractor. Since the City was owed a valid debt by Northeast representing rent arrears, defendant

concludes that the money was properly applied to this obligation.

This contention is without merit. It is apparent that if Northeast had assigned the amount due to it under the contract to a creditor, the assigned funds would be subject to the trust imposed by the Lien Law *(Wade v Nassau Suffolk Lbr. & Supply Corp.,* 275 App Div 864). The transaction is no less subject to the statute because the City contrived to have funds that it originally owed to the contractor assigned to it by the contractor in payment of the contractor's debt.

Even accepting, merely for the sake of argument, that the City's receipt of funds from Chubb was entirely outside the operation of the Lien Law, those funds became subject to the trust impressed by Lien Law § 70 (1) as soon as they were credited to Northeast, as contractor, in compensation for completed repair work on the cranes. Irrespective of which party, Northeast or the City, might be said to have received payment from the carrier, once that portion of the insurance proceeds was identified to the construction project by crediting the amount to the general contractor, it became a trust asset *(Land-Site Contr. Corp. v Marine Midland Bank,* 177 AD2d 413, 414).

It is settled that the Lien Law may not be evaded by the device of assigning offsetting amounts to different accounts, even where the intent is to satisfy an outstanding debt *(Caristo Constr. Corp. v Diners Fin. Corp.,* 21 NY2d 507). In *Caristo,* a subcontractor that owed money to its suppliers assigned money due to it under construction contracts to a third party (a factor), which then issued checks in like amounts to the subcontractor that were used to pay debts to entities other than beneficiaries specified in Lien Law § 71. As the Court of Appeals noted, "In accepting the assigned trust funds * * * the factor, therefore, participated in a diversion of trust assets under section 72 of the Lien Law" *(supra,* at 513). In the matter at bar, a contractor that owed money to its subcontractor assigned money due to it under a construction contract to a third party (the City), which then issued payment to an entity (lessor Department of Ports and Terminals) other than a beneficiary specified in Lien Law § 71. Although the dissenter purports to distinguish *Caristo* from the matter before this Court, the circumstances are remarkably similar. It is impossible to view the City's involvement in this matter, in which it is both assignee of funds due to its contractor and

ultimate acquisitor of those funds, as anything less than participation in a diversion of trust assets.

The purpose of the trust imposed by the Lien Law is "to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction (§§ 70, 71)" *(supra,* at 512). Simply expressed by this Court, "the statute was designed to protect parties who performed the construction work" *(Land-Site Contr. Corp. v Marine Midland Bank, supra,* at 414). In keeping with the remedial purpose of article 3-A of the Lien Law, a contractor may not pay itself or any of its valid business expenses prior to payment of subcontractors and materialmen *(Donjon Mar. Co. v Mergentime Corp.,* 203 AD2d 129). The broad protection afforded to subcontractors by the comprehensive statutory trust provisions of the Lien Law requires, in the first instance, that trust assets be used for the benefit of trust beneficiaries designated in the statute before being applied to any other purpose (Lien Law § 71 [2] [a]).

In *Aquilino v United States* (10 NY2d 271), the Court of Appeals held that a Federal tax lien could not be satisfied out of funds representing payment for remodeling work on an owner's property. The Court concluded *(supra,* at 282), "as a matter of New York law, a contractor does not have a sufficient beneficial interest in the moneys, due or to become due from the owner under the contract, to give him a property right in them, except insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries have been paid." Amendment of the statute in 1959 did not attenuate the public policy of this State to protect those that actually supply the labor and materials for an improvement of real property or a public improvement project *(supra,* at 281).

We have no quarrel with the dissenter that the City is not, ordinarily, a trustee pursuant to Lien Law § 70 (1). Under "a contract for a public improvement", this provision impresses a trust only upon funds received by the contractor and not upon those received by the State or municipality, as the owner of public property upon which an improvement is erected. However, while the City is entitled to hide behind the shield afforded by the statutory exemption from the obligation of trustee, it is not entitled, as a matter of equity if not law, to wield that exemption as a sword to defeat the protection otherwise afforded to a subcontractor by the statute. By taking assignment of funds due to the contractor under the construction contract, the City became the holder of trust funds

*(Caristo Constr. Corp. v Diners Fin. Corp., supra,* at 510, 512; *Wade v Nassau Suffolk Lbr. & Supply Corp., supra; see also, Land-Site Contr. Corp. v Marine Midland Bank, supra; Shore Bridge Corp. v Utica Structural Steel,* 268 App Div 714, *affd* 295 NY 619). Our point of departure from the analysis performed by the City and adopted by the dissenter is that, in order for Northeast to have "waived" its right to the final check tendered by Chubb, it had to have a property right in the proceeds that it could waive (or "assign", as Northeast accurately characterizes it).

The best reasoned theory is no more sound than the fundamental presumptions upon which it rests. The otherwise logical reasoning of the dissenting opinion is entirely dependent, for its conclusion, on the assumption that the contractor never had anything more than a right of action against the City for the amount due to it under the contract to improve public property. The hypothecated right of action, however, is simply not reflected in the facts stipulated or the documentary evidence of record. The contractor clearly assigned a sum certain to the City—viz., a chose in possession—and not merely a right to assert a claim uncertain as to either recovery or amount—viz., a chose in action. If the right of the contractor to receive payment of the final check issued by the insurer was ever in any doubt, it was resolved when the City stipulated to credit Northeast with the full face value of the instrument. That the contractor assigned all "right title and interest" in the draft to the City, rather than its face value, does not evince a valid controversy either as to Northeast's right to receive payment or the amount due. Any nascent right of action the contractor might be said to have had against the City ripened into a sum certain and paid when the City agreed to take assignment of the full amount of the check and, as the stipulation of facts recites, "directed The Department of Ports and Terminals to credit as rent the final Chubb payment of $290,579.03 against the balance then due on [Northeast's] rent account under the Lease." Thus, this transaction discharged a valid debt completely unrelated to the performance of the repair contract and owed by Northeast to an entity other than a permissible beneficiary under Lien Law § 71.

The only obligation imposed on the City to credit any payment to Northeast arises out of the contract to repair the storm damage to the City's marine terminal. The disputed sum of money, whatever its origin, is therefore an amount

"due or to become due from the owner under the contract" *(Aquilino v United States, supra,* at 282) and constitutes a trust asset within the purview of the Lien Law. While a subcontractor remains unpaid for work it has performed, the assignment by a contractor to a party, other than one designated as a statutory beneficiary, of funds due under a contract for a public improvement is contrary to law (Lien Law § 70 [1]; § 71 [2]; § 72 [1]). By assigning money due to Northeast under the contract to defendant City, the contractor violated the statutory proscription. For the City's part, it is settled that the assignee of funds payable to a contractor is liable for diversion of those funds *(Caristo Constr. Corp. v Diners Fin. Corp., supra,* at 512), unless the assignment is duly filed (Lien Law §§ 16, 25 [5]), irrespective of whether those funds physically come into the possession of the assignor or not *(compare, Wade v Nassau Suffolk Lbr. & Supply Corp., supra,* with *Shore Bridge Corp. v Utica Structural Steel, supra).*

Contrary to the position taken in its appellate brief, the claim of the City to the disputed check is not equivalent to the interest of plaintiff subcontractor. Pursuant to the statutory scheme, the nature of the claim advanced by plaintiff is superior to the claim asserted by the City. "One asserts the right of a *cestui que* trust against a trustee; the other asserts a contractual obligation of a debtor to his creditor" *(Matter of People [Consolidated Indem. & Ins. Co.],* 287 NY 34, 38-39). It is the avowed purpose of the Lien Law to elevate the claim of the statutory beneficiary above that of the mere creditor, even if that creditor is a governmental entity *(Aquilino v United States, supra).*

The thesis postulated by the dissenter must fail because the contractor could not have asserted a claim against the City for payment of a check for which it had already received full value. Moreover, if the Lien Law could be avoided by the simple artifice of assigning to a creditor all "right title and interest" in an amount due under a contract subject to its provisions, the law would be eviscerated and its salutary intent subverted. While it is not necessary to the determination of this appeal, it warrants emphasis that the City would be unjustly enriched at the expense of plaintiff subcontractor if allowed to reap the benefit of the improvement to its property resulting from plaintiff's work (which the City, its contractor and its carrier have in all respects approved) without compensating plaintiff for its efforts.

This Court rejects the City's attempt, in a footnote, to place

Northeast beyond the scope of the Lien Law by portraying it "as an owner and not as a contractor." A private corporation cannot be construed as an owner of City property by any stretch of the imagination. It is considered as such for statutory purposes only where the private corporation, as lessee of public property, hires a contractor to perform work, in which case any trust impressed by the statute extends only to the interest of the lessee in the premises and does not extend to the reversionary interest of the public corporation *(Knapp v Brown,* 45 NY 207 [1871]; *Sager v Renwick Park & Traffic Assn.,* 172 App Div 359). Here, the City hired its lessee to undertake the repair work and prepare the necessary documentation to ensure payment by the insurance carrier. The City paid Northeast out of the insurance proceeds as the repair work progressed and, thus, clearly contracted for the work as owner in fee (Lien Law § 2 [3]). Furthermore, no claim is asserted against the City's interest in the premises. Finally, if the statutory exemption is not limited to the owner of public land, *any* lessee of public property acting as a contractor will be exempted from compliance with the Lien Law.

Under the stipulated facts of this case, Northeast was engaged by the City to perform repairs, paid and treated in all respects, both by the City and by plaintiff, as a contractor throughout the course of its performance. To indulge in the fiction that Northeast is not a contractor and thereby place Northeast beyond the scope of the statute is both contrary to its protective intent and offensive to principles of equity.

Accordingly, the judgment of the Supreme Court, New York County (Stuart Cohen, J.), entered May 3, 1994, upon stipulated facts and documentary evidence, which adjudged that the City account to plaintiff for the total amount maintained in a segregated account, and which awarded plaintiff a total of $487,697.37, should be affirmed, without costs.

SULLIVAN, J. (dissenting). On September 8, 1978, the City leased to Northeast Marine Terminal Co., Inc. (Northeast), a marine terminal it owned in Brooklyn together with various equipment and structures at the terminal, including two cranes, one 70, the other 50 tons, used to load and unload cargo, for 40 years at a rental which, based on a stated sum plus an additional amount dependent upon the volume of cargo processed, ranged from $800,000 the first year to approximately $2.6 million for years 11 through 40.

A lease provision required Northeast to maintain casualty

insurance covering the demised premises and the equipment "for the benefit of Lessor." In the event of a casualty not so extensive as to render the premises unsuitable for the lessee's stevedoring business, the lease afforded the City the option to repair, rebuild or replace, which, if exercised, would obligate Northeast to pay rent without interruption during the repair period. Any such repairs, however, would be made "only * * * to the extent of insurance proceeds actually received by Lessor and any contributions by Lessee." In accordance with its lease obligation, Northeast procured a policy from Federal Insurance Company, an affiliate of Chubb & Son, Inc., affording such coverage in the sum of $9.6 million and providing that "the City of New York Department of Ports and Terminals is a named insured under this Policy with respect to the 70-ton and 50-ton Starporter Cranes, and loss, if any, is payable to them."

On June 3, 1980, as a result of a windstorm, the two cranes sustained substantial damage, which the City elected to repair. To expedite matters, the City and Northeast entered into an agreement, apparently oral, that Northeast would be responsible for assuring the proper completion of the repair work, that it would retain plaintiff Canron Corp. to do the brunt of said work and submit to Chubb all required documentation to assure Federal's payment of the claim and that the City would pay Northeast the repair costs to the extent it received insurance proceeds covering the loss. For these costs to be paid by the City, the City also required that its own representatives approve the work and all invoices submitted. At the same time, Chubb, for Federal, agreed that the loss proceeds would cover the full costs of repair. In accordance with its agreement with the City, Northeast retained Canron on or about July 29, 1980 to do the repair work, which took approximately 11 months and was completed in June of 1981.

Over the course of the repair, Canron submitted periodic invoices, totalling $797,549.05, to Northeast, which, after a review and approval of the same, forwarded them to Chubb for processing. All invoices submitted by Canron were approved by the City. Northeast also billed $145,266.83 for work it performed. Of that sum the City approved all but $7,747.15. Thus, the total claim submitted to Chubb was $942,815.88, and the total approved by the City was $935,068.73. Chubb, for Federal, paid the loss in six installments, the first, $55,000, by check in July 1980; the second, $93,794.31, by check on September 4, 1980; the third, $180,840.15, by check on Novem-

ber 18, 1980; the fourth, $243,726.42, by check on December 2, 1980; the fifth, $78,875.97, in February 1981; and the sixth, $290,579.03, on June 25, 1981. Each of the six checks was made payable to Northeast and the City jointly and delivered to Northeast, which endorsed the check in blank and forwarded the same to the City.

When Northeast forwarded the first five Chubb checks to the City, it also, at or about the same time, sent its own voucher requesting payment from the City in an amount equal to the Chubb check, specially requesting, in each instance, that the City make its check payable directly to Canron. In accordance with Northeast's request, the City made its first check, dated August 1, 1980, in the sum of $55,000, payable directly to Canron and delivered it to Northeast. The City's next four checks, in the amounts of $93,794.31, $180,840.15, $243,726.42 and $78,875.97, were made payable to and delivered to Northeast.

With respect to the sixth check, the disposition of which is the subject of this lawsuit, a brief digression from the chronological narrative is in order. At the time of the June 3, 1980 windstorm Northeast was in substantial arrears in its rent obligations. After protracted discussions during the spring and summer of 1980, the City and Northeast reached an oral agreement calling for monthly payments of $15,000 by Northeast through 1980 and other specified payments thereafter. Northeast made only one such payment, in July of 1980, and, by January 1, 1981, its rent arrears had grown to $1,245,520.08. After another oral agreement concerning this indebtedness, pursuant to which more payments were made, the City and Northeast reached yet another agreement, this one in writing, on July 9, 1981, when Northeast's arrears totalled approximately $1,822,562, calling for Northeast to pay current rent on a monthly basis beginning in April 1981 and to amortize the arrears in accordance with an agreed schedule. The payment due on the signing of the agreement was $722,150.13.

On that same day, Northeast delivered two of its own checks, in the amounts of $142,619.32 and $92,721, payable to the City to apply to the sum due under the payment agreement. Northeast also delivered a third check, Chubb's sixth and final check, in the sum of $290,579.03, in payment of the casualty loss. That check, dated June 25, 1981, was, as in the case of the five previous checks, made payable to Northeast and the City.

Northeast endorsed the sixth check in blank and forwarded it with the two other checks and a covering letter stating that Northeast was assigning to the City all of its right, title and interest in the Chubb check, the proceeds of which the City should apply together with the proceeds of the other two checks toward the payments due the City under the agreement of the same date with respect to its rent arrears. Northeast advised the City that it would "indemnify you and hold you harmless for any claim of non-payment arising or occurring by virtue of not applying any or all of the proceeds of the Chubb draft toward payment of the repair of the crane". As instructed, the City credited the proceeds of all three checks against the sum due from Northeast with respect to its rent obligations.

Of the $797,549.05 billed Northeast by Canron, Northeast paid Canron all but $265,271.90. Northeast subsequently, on November 25, 1981, filed for bankruptcy, and Canron requested of the City the balance due it by Northeast. The City has refused to pay the $265,271.90 claimed by Canron, although it has segregated in a separate account that amount with accrued interest.

Canron thereafter commenced this action against the City and certain of its officials seeking to recover the $265,271.90 pursuant to, *inter alia,* article 3-A of the Lien Law. After extensive motion practice, the parties agreed to submit the case for disposition on a stipulated statement of facts and exhibits. The IAS Court held that the City violated article 3-A of the Lien Law and directed it to pay Canron the $265,271.90 balance with interest, finding that the repair of the cranes was an improvement, that Northeast's right to payment for the final portion of the repair work constituted an asset contemplated by an article 3-A trust, which the City had diverted. Without considering whether the City might have defenses or counterclaims to any right of action asserted by Northeast with respect to the final payment, the court awarded Canron the entirety of the sum that might have been claimed by Northeast in such a cause of action. This was error as a matter of law.

Article 3-A of the Lien Law "was designed to create trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction [citation omitted]." *(Caristo Constr. Corp. v Diners Fin. Corp.,* 21 NY2d 507, 512.) In establishing a trust for certain

beneficiaries in cases of an improvement of real property, article 3-A makes a distinction between an improvement of real property not belonging to the State or a public corporation (Lien Law § 2 [8]), and an improvement of real property owned by the State or a public corporation (id., § 2 [7]). In a private improvement, certain funds received by an owner and a contractor are deemed to constitute trust assets. (See, Lien Law § 70 [1].) In the case of a public improvement, however, while the funds received by a contractor constitute trust assets, the funds received by an owner do not. (Ibid.) Thus, where a public improvement is involved, the party asserting the protection of article 3-A must show that the assets alleged to be covered by a trust are those of the contractor.

Not all contractor assets in a public improvement project, however, qualify as a trust asset within article 3-A. To be covered by the trust, an asset must first qualify either as funds received by the contractor under or in connection with the public improvement contract or as the contractor's right of action for such funds due or earned or to become due or earned. (Ibid.) Moreover, the assets must be the funds received by the contractor or his right of action for payment thereof of the type listed in Lien Law § 70 (6), which includes, inter alia, the "proceeds of any insurance payable because of destruction of the improvement of real property" (id., § 70 [6] [c]; see, Kingston Trust Co. v Catskill Land Corp., 43 AD2d 995; York Corp. v 1955 Assocs., 20 AD2d 538).

To be sure, a general contractor's right of action against an owner to recover payment for work with respect to a public improvement constitutes a trust asset (see, Lien Law § 70 [1], [6]), and that trust asset may not be applied except for trust purposes until all claims against the contractor relating to the work performed, such as claims to compensation by subcontractors, have been satisfied (id., § 71 [2]; § 72 [1]). When an unpaid subcontractor sues, alleging that a right of action of the type described has been diverted for a purpose extrinsic to trust purposes, the court may enforce on behalf of the subcontractor the contractor's diverted right of action. (Id., § 77 [3] [a] [ii].)

The conferral of trust status on a general contractor's right of action against the owner for payment does not enlarge that right or mean that the contractor or a subcontractor hired by the contractor and standing in the contractor's shoes is, per se, entitled to payment. Like any other cause of action, a contractor's right of action stands or falls on its own merits.

That much is made clear by Lien Law § 70 (1) (a), which provides, "[T]he fact that the right [of action] is a trust asset does not enlarge the right or excuse any performance or condition upon which it depends." Thus, the subcontractor takes the general contractor's right of action as it is, that is, subject to whatever infirmities it may have or defenses with respect thereto.

In the instant case, the IAS Court found that the repair work constituted a public improvement, that the City, as owner, in effect, hired Northeast as a general contractor and that Northeast, as general contractor, hired Canron as its subcontractor. Thus, the court held, Northeast qualified as a contractor within the Lien Law. The court further found that since Northeast, through its own work and that of Canron, its subcontractor, completed the necessary repair work it had a right of action against the City to recover the balance due on the repairs. Finally, the court found that Northeast waived this right by its July 9, 1981 letter agreeing to indemnify the City against claims for nonpayment of the crane repairs in consideration of the City's application of Chubb's sixth casualty loss check to Northeast's rent arrears. The court viewed this waiver as a trust asset diversion and awarded Canron the full amount sought on the premise that it was merely enforcing Northeast's right of action. The court's reasoning was faulty on several grounds.

Even assuming that Northeast was a contractor under the Lien Law with respect to the crane repair, a concept that is less than clear,[1] Canron was entitled to no more than Northeast could have recovered had it asserted its right of action against the City. In that regard, the City would have had valid defenses which would have barred Northeast's recovery. Under Lien Law § 70 (1), Canron's rights can be no greater than those of Northeast.

Where an owner hires a general contractor who, in turn, engages a subcontractor and the subcontractor does not re-

---

1. A lessee who, with the owner's consent, performs repairs upon the demised property is, for purposes of the Lien Law, an owner and not a subcontractor. (See, e.g., McNulty Bros. v Offerman, 221 NY 98; Landes v Landes, 243 App Div 464.) A vendee in possession, however, who, unlike here, received funds in connection with a contract for a public improvement and, acting as a general contractor, entered into a contract with a subcontractor for the improvement of the property, will be treated as a general contractor under the Lien Law. (Burns Elec. Co. v Walton St. Assocs., 136 AD2d 291, affd 73 NY2d 738.)

ceive full payment, the subcontractor's rights under the Lien Law to recover against the owner are derivative of those of the general contractor and are limited to satisfaction out of the amount established as due from the owner. *(Strain & Son v Baranello & Sons,* 90 AD2d 924, 925.) The subcontractor's rights rest upon a theory of subrogation; he thus stands in the general contractor's shoes. *(Anderson v Hayes Constr. Co.,* 243 NY 140, 150; *Szemko v Weiner,* 176 App Div 620.) His right to recovery under the Lien Law can be no greater than the general contractor's, had the latter itself asserted the claim *(Wexler v Rust,* 144 App Div 296), and his lien is limited to the amount due the general contractor by the owner *(Trustees of Hanover Sq. Realty Investors v Weintraub,* 52 AD2d 600; *Central Val. Concrete Corp. v Montgomery Ward & Co.,* 34 AD2d 860). These principles are, as previously noted, codified in Lien Law § 70 (1) (a), which provides that "the fact that the right [of action] is a trust asset does not enlarge the right".

In the instant case it is uncontroverted that beginning in February of 1980, months before the June 3, 1980 windstorm which caused the damage to the cranes, Northeast had accumulated substantial arrears in its rent obligation. By July of that year, it was $752,000 in arrears, and one year later the debt had grown to $1,800,000. Northeast's lease with the City specifically provided that its rent obligation would continue unabated during the period of repair of a casualty loss unless, as undeniably is not the case here, the loss were so extensive as to make the premises wholly unsuitable for their intended use.

Thus, had Northeast sued the City directly for the balance due under the agreement to repair, the City would have asserted as a counterclaim Northeast's failure to meet its rent obligations and the amount due thereunder *(see,* CPLR 3019), or, at the very least, as a recoupment claim or offset *(see, Matter of Midland Ins. Co.,* 79 NY2d 253). Since the amount of rent arrears due the City greatly exceeded any claim Northeast could have asserted on its right of action for unpaid repair work, Northeast would not have been entitled to any recovery whatever.

The majority's response to this point, i.e., "that the Lien Law may not be evaded by the device of assigning offsetting amounts to different accounts, even where the intent is to satisfy an outstanding debt", misses the mark and ignores the command of Lien Law § 70 (1) (a) that the mere fact that the right of action is a trust asset "does not enlarge the right."

*Caristo Constr. Corp. v Diners Fin. Corp.* (21 NY2d 507, *supra*), which the majority cites, did not deal with an owner-trustee's right of offset against a trust beneficiary's right of action under the Lien Law. The issue there was whether a factor, who, under an unfiled assignment of accounts receivable, received from a defaulting subcontractor, which subsequently became insolvent, a general contractor's payments intended for other subcontractors, trust beneficiaries under the Lien Law, is liable for a diversion of trust funds. The factor, who knew that the pledged accounts were the result of construction projects and therefore that the general contractor's checks—payable to the subcontractor and endorsed by the latter but deposited by the factor in a way to mask its involvement—were trust funds, returned to the subcontractor, as part of a revolving credit, simultaneously with receipt of the payments, advances in amounts equal to the payments received. The Court held that the factor was guilty of a diversion when it received the entrusted payments and again when it gave its checks or advances for the entrusted payments.

That is not the case here. Canron's claim before the IAS Court and that court's ruling as to Canron's entitlement to a trust asset is limited to Northeast's right of action against the City to which Canron, as a subcontractor with unpaid construction claims against Northeast, is subrogated. That right of action, as Lien Law § 70 (1) and case law make clear, is not enlarged by virtue of its trust status. In the instant case, it is subject to the City's offset for the unpaid rent which Northeast owed it. Nor is *Aquilino v United States* (10 NY2d 271), also cited, of any assistance to the majority since it too did not deal with a right of action trust res but rather moneys subject to the trust due the contractor.

The majority rejects the notion that Canron, as subcontractor, can assert no greater right to the Chubb funds than Northeast, as contractor, and concludes that the funds "became subject to the trust impressed by Lien Law § 70 (1) as soon as they were credited to Northeast" in compensation for repair work on the cranes. The fundamental flaw in this reasoning is that it assumes that Northeast somehow acquired an interest in the disputed funds. The parties, by their stipulation of facts, have expressly agreed that the lease required Northeast to maintain casualty insurance covering the demised premises and all equipment "for the benefit of Lessor". The stipulation further states that the insurance policy pur-

chased by Northeast provided that the City "is a named insured under this Policy with respect to the 70-ton and 50-ton Starporter Cranes, and loss, if any, is payable to them." Thus, despite delivery of the check to Northeast, its temporary possession thereof and the fact that both it and the City were included as payees, no claim can be made that Northeast either received, within the meaning of section 70 (1), was credited with or could assign the funds from Chubb or that it had any rights whatsoever with respect to such funds; only the City had such rights.

Apparently recognizing that the IAS Court's theory that Northeast's right of action against the City constitutes an impenetrable trust asset, the offset of which against a prior debt amounts to a diversion, may not be on solid footing, Canron now posits, as its main argument, an entirely new theory, never advanced before the IAS Court. Canron argues that the final Chubb check delivered to Northeast constituted, as insurance proceeds under Lien Law § 70 (6) (c), a trust asset, which it claims was diverted. This argument is meritless.

Former section 4-a of the Lien Law,[2] whose requirements were intended to be maintained by the present section 70 (6) (c), applied only to the "proceeds of any insurance which by the terms of the policy are payable to a contractor or subcontractor." Similarly, pursuant to Lien Law § 70 (1), the only funds received in connection with a contract for a public improvement which constitute assets of a trust are those "received by" a contractor or subcontractor. Since, as noted, in accordance with the parties' stipulation of facts, the insurance proceeds were properly payable to the City, not Northeast, allegedly the general contractor, Lien Law § 70 (6) (c) is not

---

**2.** Insofar as is relevant, section 4-a provided: "The proceeds of any insurance which by the terms of the policy are payable to the owner of real property improved, and actually received or to be received by him because of the destruction or removal by fire or other casualty of an improvement on which lienors have performed labor or services or for which they have furnished materials, shall * * * be subject to liens provided by this act". Identical language was utilized as respects the receipt of insurance proceeds by a contractor or subcontractor to whom, by the terms of the policy, such proceeds were payable. The statute referred to "insurance * * * payable to a contractor or subcontractor * * * because of * * * destruction * * * of an improvement on which he has performed labor or services or for which he has furnished materials." The intent to cover only improvements as to which, at the time of the insured loss, the lienors or contractors or subcontractors have performed labor or services or furnished materials is apparent.

applicable. Moreover, the proceeds were not "received by" Northeast within the meaning of Lien Law § 70 (1). That the check in question was made payable to both Northeast and the City and delivered to Northeast does not alter the analysis since only the City had the right to receive the funds. Where a party which has no proper entitlement thereto receives funds the funds are not a trust asset under article 3-A, even if the funds otherwise meet the criteria therefor. *(New York Plumbers' Specialties Co. v Fitzgerald,* 265 App Div 949.)

There is yet another reason why the proceeds of the sixth check do not qualify as a trust asset. Lien Law § 70 (6) (c) does not cover insurance payable as a result of destruction or other casualty loss that precedes the repair or renovation work which gives rise to the trust. Section 70 (6) (c) confers trust status on funds received by a contractor "as proceeds of any insurance payable because of destruction of the improvement of real property including a home improvement or public improvement or its removal by fire or other casualty, except that the amount thereof required to reimburse the contractor for premiums paid by him out of funds other than trust funds shall not be deemed part of the trust assets." A "public improvement" is an "improvement of any real property belonging to the state or a public corporation." (Lien Law § 2 [7].) An "improvement" is defined as including "the demolition, erection, alteration or repair of any structure upon, connected with, or beneath the surface of, any real property and any work done upon such property or materials furnished for its permanent improvement" *(id.,* § 2 [4]). Thus, to qualify as a trust asset, the insurance payment must be generated by damage to the improvement itself, and not merely by damage which created the need for the improvement.

The legislative history of the insurance proceeds provision, both in terms of the owner (Lien Law § 70 [5] [f]) and the contractor *(id.,* § 70 [6] [c]) as a trustee, confirms this view. Both provisions derive from Laws of 1930 (ch 859, § 6), which, prompted by a report of a joint legislative committee, added insurance proceeds to the roster of trust assets. According to the report, the committee found, "after careful study of the Lien Laws, that no provision has even been made in the State to establish the lien of laborers, materialmen and contractors against any moneys received by the owner upon policies of insurance during the improvement of the property. It is manifest that if the property is destroyed by fire, or the

elements, that such persons are sometimes in great danger of losing whatever lien they may have against the property for contribution to the improvement." (Report of Joint Legis Comm Investigating Lien Law, 1930 NY Legis Doc No. 72, at 12.) It is clear that the Legislature's concern was with the protection of workers and materialmen who have worked on the improvement and damage, covered by insurance, occurs during the course of the work on the improvement.

This was also made clear by the language of the statute adopted in 1930 as section 4-a of the Lien Law.[3] When the present article 3-A was added to the Lien Law by Laws of 1959 (ch 696), former section 4-a, with modifications, was transferred to the present section 70 (5) (f), (6) (c) and (7) (c). The 1959 Report of the New York Law Revision Commission (at 213, 218) makes it clear that, with the exception of the addition of a new trust asset class created by Lien Law § 70 (5) (e), no substantive changes were intended in the definitions of trust assets covered by subdivisions (5), (6) and (7) and that the language change was intended merely to simplify the terminology of the former section 4-a's trust asset provisions. Thus, section 70 (6) (c) should be interpreted identically with former section 4-a, which confers trust status on insurance proceeds payable to a contractor and received by him "because of the destruction or removal by fire or other casualty of an improvement on which he has performed labor or services or for which he has furnished materials." Since the casualty loss in the instant case occurred before any work on the cranes began, the insurance proceeds represented by Chubb's sixth check do not qualify under Lien Law § 70 (6) (c) as a trust asset.

Thus, while the Legislature has provided extensive protection for subcontractors, materialmen and laborers in article 3-A, it did not provide blanket protection or mandate that all potentially available payment sources be dedicated to trust purposes. Instead, it fashioned a statutory scheme that struck a balance between the various competing equities. That balance permits the City, in the circumstances presented, to assert its substantial monetary claims against Northeast as an offset to Northeast's right of action being asserted by Canron, as Northeast's subrogee, which had sufficient measures available to protect itself. Moreover, the insurance proceeds represented by the sixth Chubb check, allegedly diverted by North-

3. *See*, n 2.

east for the City's benefit, are not, for the reasons discussed, part of the trust res.

Accordingly, the judgment should be reversed and the complaint dismissed.

MURPHY, P. J., ASCH and WILLIAMS, JJ., concur with RUBIN, J.; SULLIVAN, J., dissents in a separate opinion.

Judgment, Supreme Court, New York County, entered May 3, 1994, affirmed, without costs.